693 P.2d 960

**Harold A. BELL, Plaintiff-Appellant,**

v.

**STATE of Arizona, a body politic, Defendant-Appellee.**

**No. 1 CA–CIV 7217.**

Court of Appeals of Arizona, Division 1, Department B.

Sept. 25, 1984.

Reconsideration Denied Nov. 8, 1984.

Review Denied Jan. 22, 1985.

Miller & Pitt, P.C. by Richard L. McAnally, Grace McIlvain Williams and Thomas G. Cotter, Tucson, for plaintiff-appellant.

Jones, Skelton & Hochuli by Edward G. Hochuli and Mark D. Zukowski, Phoenix, for defendant-appellee.

## OPINION

MEYERSON, Presiding Judge.

### I.  FACTS

This is a negligence action for personal injuries arising out of a stabbing at the

Arizona State Prison (Prison) in Florence. The jury returned a verdict in favor of defendant State of Arizona (State) and plaintiff Harold A. Bell (Bell) has brought this appeal from the judgment and denial of his motion for new trial. Although Bell has raised several issues on appeal, we need only address his allegations of error regarding the admission of character evidence and the giving of certain jury instructions.

Bell entered the Prison in July, 1975. He had previously been incarcerated in a federal institution and at the time of trial had spent a total of eight and one-half years in prison. In 1977, he joined the Aryan Brotherhood (Brotherhood), a white supremacist group. Bell was aware of the violent nature of the gang and understood that once he joined he was a member for life and that the only way out of the gang was by death. Bell understood that he was expected to follow any orders given by Brotherhood members and that he could be severly injured or killed if he refused to carry out such orders.

Unknown to prison officials, Bell was ordered by the Brotherhood to kill William Ray, another inmate. Although Bell objected, he was told that if he did not participate in the murder of Ray, he would be killed by the Brotherhood. Bell testified that he did not intend to kill Ray, but attempted merely to fake the "hit" to protect himself. The Ray stabbing occurred in October, 1977, while Bell was still in the general population. Although Bell failed to request any protective measures from the prison administration, he was nevertheless transferred out of general population. Prison officials knew that Bell was a Brotherhood member and believed that retaliation against Bell by non-Brotherhood inmates was possible for Bell's participation in the attack on Ray. As a protective measure, Bell was placed in administrative custody with other Brotherhood members and segregated from the general prison population. Bell, of course, realized he had

the most to fear from the Brotherhood because Ray survived, but he believed he had successfully convinced the Brotherhood that he had not "faked" his participation in the Ray stabbing.

In January, 1978, another inmate informed one of the prison sergeants that a prisoner named "Harry" was going to be stabbed by the Brotherhood. The informant did not know Harry's last name but he knew his cell number. The sergeant checked and found that Bell was housed in that cell. The sergeant wrote this information down in an incident report which was ultimately reviewed by Warden Harold Cardwell. Prison procedure provided that such information would not be acted upon until substantiated as reliable. Thus, no action was taken to protect Bell. Captain Dale Davis, head of the prison investigation and intelligence section, never saw this incident report. He testified, however, that if he had seen the report, he would have done something about it. Other prison officials testified that they would have acted to protect Bell if they had known of the threat on his life.

On January 28, 1978, Bell and seven other Brotherhood members were placed in the exercise yard behind cellblock 3. The tower officer, who had the responsibility for guarding the inmates while they were exercising, suspected that something was wrong. The tower guard had not been informed of the threat on Bell's life nor did he know that the inmates he was watching were Brotherhood members under administrative segregation. While in the yard, Bell was stabbed seven times. A metal prison-made knife was subsequently surgically removed from his heart in a Phoenix hospital.

## II. CHARACTER EVIDENCE

The State attacked Bell's character throughout the trial. In his opening statement, State's attorney Edward G. Hochuli said that Bell "went on to extort, prostitute and to kill people in prison."[1] Counsel

---

1. No evidence was presented that Bell had engaged in any homosexual conduct in prison or that he killed anyone.

suggested to the jury that Bell should not receive any money for his injury because he was a violent and bad person. Specifically, counsel stated that Bell "wasn't just another inmate down there, he was a select inmate. He was causing the violence." During counsel's cross-examination of Bell, he repeatedly asked Bell about his violent behavior through such questions as: "In fact, Mr. Bell, isn't it true that by late 1977, you would agree with me, that you were one of the bad ones, one of the violent ones in the Arizona State Prison?" On at least three separate occasions Bell was asked if he was part of the "hard-core" of prison inmates causing violence. The attack on Bell's character lasted throughout the trial and into closing argument when counsel for the state again described Bell as the "hard-core that created" the violence in the state prison.

■ Rule 404, Arizona Rules of Evidence (Rule), governs the admissibility of character evidence.

(a) **Character evidence generally.** Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:

(1) *Character of accused.* Evidence of a pertinent trait of his character offered by an accused, or by the prosecution to rebut the same;

(2) *Character of victim.* Evidence of a pertinent trait of character of the victim of the crime offered by an accused, or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor;

(3) *Character of witness.* Evidence of the character of a witness, as provided in Rules 607, 608, and 609.

(b) **Other crimes, wrongs, or acts.** Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

The broad prohibition against the admissibility of character evidence to prove that an individual acted in conformity therewith on a particular occasion is applicable in both civil and criminal cases. Exceptions (1) and (2) to Rule 404(a) are, by their own terms, applicable only in criminal cases. *Blankinship v. Duarte*, 137 Ariz. 217, 221, 669 P.2d 994, 998 (App.1983).

■ Character evidence may be offered in a civil case to prove character when it is "in issue." Character is in issue when a person's possession of a particular character trait is an operative fact in determining the legal rights and liabilities of the parties and thus is one of the ultimate issues in the case. For example, in a parental severence case, fitness to act as a parent is an essential element, thus permitting proof of specific acts showing unfitness. *Appeal in Pima County Juvenile Action No. S–949*, 134 Ariz. 442, 657 P.2d 430 (App.1982). This exception is not applicable in the case before us.

The use of character evidence has traditionally been limited because it is of slight probative value and the strong likelihood of prejudice or confusion resulting from its admission. *See generally* 2 J. Weinstein & M. Berger, *Weinstein's Evidence* 404–1–142 (1982); S. Saltzburg & K. Redden, *Federal Rules of Evidence Manual* 124–56 (3d ed. 1982).

"Character evidence is of slight probative value and may be very prejudicial. It tends to distract the trier of fact from the main question of what actually hap-

Bell has raised as a separate issue on appeal the contention that the State's repeated references to homosexuality constituted misconduct of counsel and were prejudicial. *Elledge v. Brand*, 102 Ariz. 338, 429 P.2d 450 (1967). Although the references to homosexual conduct would not form an independent basis for reversal, the numerous references to homosexuality magnified the prejudicial impact of the inadmissible character evidence.

pened on the particular occasion. It subtly permits the trier of fact to reward the good man and to punish the bad man because of their respective characters despite what the evidence in the case shows actually happened."

Rule 404, advisory committee note. *See* 1 M. Udall & J. Livermore, *Law of Evidence* § 83 (2d ed. 1982). "[E]vidence of one's character is generally inadmissible to prove his conduct on a certain occasion." *Pyeatte v. Pyeatte,* 21 Ariz.App. 448, 453, 520 P.2d 542, 547 (1974).

■ Early in the trial, the trial court ruled that evidence pertaining to Bell's propensity for violence would be admissible and stated the following reason:

Now, the question of this man's propensity for violence is material in this case, on the issue of whether or not he was relying on self help, because if he knew he was in danger and relying on self help, then that is going to the issue of what we have been calling contributory negligence. It isn't really contributory negligence, but it is some kind of a defense, and that has to be weighed against the prejudicial effect of it.[2]

The State points out that its entire defense at trial rested on the theory that Bell knew he was in danger for failing to successfully accomplish the "hit" on Ray and that he was contributorily negligent by attempting to protect himself by taking matters into his own hands. Thus, the State argues that evidence tending to show that Bell possessed knowledge of the prison system was relevant to enable the State to demonstrate that Bell knew the Brotherhood was a violent gang and that he would be the subject of retaliation.

But there is a significant difference between evidence showing Bell's knowledge of prison life and knowledge of the violent nature of the Brotherhood, and evidence squarely pointing the finger at Bell as being part of the hard-core group causing

prison violence. Bell's knowledge of the violent nature of the Brotherhood and his actions leading up to the retaliation against him are relevant to the State's contributory negligence defense. But evidence of Bell's alleged violent character is only circumstantially relevant and is laced with all of the dangers which have led courts and the drafters of the rules of evidence to mark a bright line prohibiting the introduction of such testimony. Stated simply, character evidence tending to show that Bell was the type of person to rely on self-help was inadmissible and prejudicial.

The defense of self-help or contributory negligence has been raised in other cases where prisoners brought suit for injuries received at the hands of their fellow inmates. *See generally Annot.,* 41 A.L.R.3d 1021 (1972). These cases demonstrate the distinction described above. In *Walker v. United States,* 437 F.Supp. 1081 (D.Or. 1977), the plaintiff was threatened several times by another inmate but never notified the prison authorities that he was in danger. On the day he was stabbed, the plaintiff received information that the other inmate intended to kill him. The plaintiff secured a knife and placed a table at the entrance to his cell to prevent the other inmate from entering. The plaintiff was found to be contributorily negligent by failing to seek protection from prison authorities. In *Johnson v. United States,* 258 F.Supp. 372 (E.D.Va.1966), the court found the plaintiff was barred from recovery because of his own acts which included approaching and bothering other inmates which led to his injury.

These cases point out that a plaintiff-prisoner's knowledge and specific conduct which lead up to an act of retaliation are indeed admissible for the purpose of proving the defense of self-help or contributory negligence. Thus, the trial court correctly admitted evidence and allowed argument pertaining to Bell's knowledge of prison

---

**2.** Apparently, the trial court viewed the evidence concerning Bell's propensity for violence and evidence of his knowledge of the Brotherhood as inseparable. As explained more fully herein,

such a conclusion is incorrect. Thus, Rule 404(b) does not assist the state's position. Finally, there is no contention that the character evidence was admissible under Rule 404(a)(3).

life, Bell's understanding of the Brotherhood, his stabbing of the other prisoner and the fact that he failed to inform prison authorities of his potential dangerous situation. However, such evidence is dramatically different from the other admitted testimony regarding Bell's personal propensity for violence. Although the State has attempted to blur the distinction between the inadmissible character evidence, and the admissible and relevant evidence of Bell's knowledge of prison life and reliance on self-help, we find there are important and legally determinative differences.

■ The State argues that Bell has failed to preserve this error for appeal contending that no timely or appropriate objections were made during the trial. But at the beginning of the second day of trial, counsel and the court discussed Rule 404 at length in chambers. Counsel for Bell vigorously argued against the admission of evidence concerning Bell's character.[3] The trial court expressly rejected that argument noting that the "propensity for violence ... [is] only material to show that [Bell] might be the kind of person who would resort to self-help after he found out that he was in trouble." Thus, Bell argued Rule 404 to the trial court and argued extensively concerning the inadmissibility of such character evidence. Once the trial court ruled that this evidence was admissible for the purpose of proving the State's defense, no further objection by Bell would have served any purpose. *See Blankinship v. Duarte*, 137 Ariz.App. at 221, 669 P.2d at 998 (properly made motion *in limine* preserves error on appeal without need for further objection).

**3.** Bell's counsel stated at one point:

Mr. McAnally: Rule 404(b) says that you cannot prove character to show that someone acted in conformity with that character, and the law is very clear that you cannot prove character to show negligence. You're allowing in the things on his knowledge of prison life, because there is the exception there for knowledge. But when he starts trying to prove that Harry Bell is violent, then he is trying to prove character and the violent character of Harry Bell, and he is trying to prove that he acted in conformity with it when he didn't ask for protective custody.

## III. CURATIVE INSTRUCTION

■ As part of the instructions on contributory negligence, the trial court instructed the jury as follows:

You may consider the evidence with respect to the [Plaintiff's] personality, background and conduct, in connection with the question of whether the Plaintiff was contributorily negligent.

Should you conclude those considerations indicate that the Plaintiff is or was a bad person, you may not deny recovery to the Plaintiff simply because he may be or may have been a bad person.

The trial court decided to give this instruction after Bell objected that the State's attorney improperly argued in closing argument that Bell should be denied recovery because he was a bad person. Although Bell's counsel did not formally "object" to the instruction, counsel argued to the trial court that the instruction might lead the jury to conclude that Bell could be found contributorily negligent if the jury did not like his personality and background.

■ As explained fully above, the use of character evidence to prove that one acted in conformity therewith is improper. The prejudicial effect of the trial court's ruling allowing the admissibility of such evidence was exacerbated by the attempted curative instruction which specifically directed the jury that it might consider evidence of Bell's personality and background in connection with the issue of whether or not he was contributorily negligent. The second sentence of the instruction which directs the jury not to deny recovery against Bell

So it doesn't come within the exception, it comes within the general rule of 404. The character evidence is not admissible to prove that someone acted in conformity.

Moments later the trial court expressly authorized the admissibility of the "propensity for violence" evidence. Unmistakably, counsel's comments were such that the court could "consider a formal, specific objection to have been made." *Cedic Dev. Corp. v. Sibole*, 25 Ariz.App. 185, 187, 541 P.2d 1169, 1171 (1975).

if the jury were to find he was a bad person, is simply inadequate to ameliorate the harmful effects of the first portion of the instruction. "[T]he subject matter of contributory negligence is so important that a failure to treat it properly in a court's instructions is fundamental error." *Kelch v. Courson,* 103 Ariz. 576, 578, 447 P.2d 550, 552 (1968).[4]

For the reasons explained above, we find that Bell was deprived of a fair trial and that the trial court abused its discretion in denying Bell's motion for new trial.[5] The judgment is reversed and this matter is remanded for a new trial in accordance with this opinion.

JACOBSON, C.J., and OGG, J., concur.

---

4. The doctrine of fundamental error is applied sparingly in civil cases. An error is fundamental only when it deprives a party of the right to a fair trial. *Maxwell v. Aetna Life Ins. Co.,* 143 Ariz. 205 at 212, 693 P.2d 348 at 355 (Ct.App. 1984). This erroneous instruction fits within the ambit of fundamental error.

5. The prejudicial impact of the State's onslaught against Bell's character was apparently recognized by the trial court. In his order denying the motion for a new trial, the trial judge stated that "if this matter had been tried to the Court there would have been a verdict for the Plaintiff." The trial judge concluded, however, that the jury did not reach a seriously erroneous result. *See Cano v. Neill,* 12 Ariz.App. 562, 473 P.2d 487 (1970).